**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| JACLYN R. GRAHAM, | ) | Civil Action No.: |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | **Violation of Title VII: Termination** |
| vs. | ) | **Based on Gender and Retaliation;** |
| | ) | **Retaliation for Filing a Worker's** |
| QUALITY BEVERAGE, L.L.C. d/b/a | ) | **Compensation Claim; Violation of the** |
| CHEERWINE, | ) | **ADA: Termination and Retaliation** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | **JURY TRIAL DEMANDED** |

The plaintiff, complaining of the acts of the defendant, alleges as follows:

1.     That the plaintiff is a citizen and resident of the County of Dorchester, State of South Carolina.

2.     That, upon information and belief, the defendant Quality Beverage, L.L.C. d/b/a Cheerwine ("defendant" or "Cheerwine") is a foreign limited liability corporation doing business and maintaining offices and agents in the County of Charleston, State of South Carolina.

3.     That this court has federal question jurisdiction of the above-styled action pursuant to 42 U.S.C. § 2000e-2, 3 and 5 of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 12101, et seq. (the Americans with Disabilities Act or "ADA" and its 2008 Amendments "ADAAA," collectively referred to as the "ADA") and 28 U.S.C. § 1331.

4.     That venue for all causes of action stated herein lies in the District of South Carolina, Charleston Division, as defendant does business in the said district, plaintiff resides in

the district, and a substantial portion of the facts giving rise to plaintiff's claims occurred in the said district.  Thus, jurisdiction and venue are proper in this court.

## CONDITIONS PRECEDENT

5.      That plaintiff has exhausted all administrative remedies and conditions precedent, including timeliness, deferral and all other jurisdictional requirements necessary for the maintenance of plaintiff's Title VII and ADA claims, all of which are more fully described below.

6.      That at all relevant times as defined by Title VII, defendant employed fifteen (15) or more employees as required by title VII.  As such, the defendant is an "employer" as defined by Title VII and is otherwise subject to and covered by said Act.

7.      That on or about February 5, 2025, and as a result of defendant's discriminatory conduct, all of which is more fully described below, plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on gender, disability and retaliation.

8.      That on or about February 18, 2025, plaintiff received a Notice of Right to Sue from the EEOC, but it was not the correct Notice of Right to Sue – it was for another person and wholly unrelated to plaintiff's Charge of Discrimination.  After notifying the EEOC of the error, ultimately on or about April 23, 2025 plaintiff received the correct Notice of Right to Sue from the EEOC regarding her Charge of Discrimination described in Paragraph 7 above.

9.      That plaintiff has timely filed the foregoing action within ninety (90) days of the date on which she received the Notice of Right to Sue described above in Paragraph 8.

**FACTUAL ALLEGATIONS**

10.     That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 9 hereinabove as fully as if set forth verbatim.

11.     That the defendant is in the business of manufacturing and distributing beverages to the general public, namely Cheerwine, a cherry-flavored soda drink.

12.     That the plaintiff is female who engaged in protected activity while employed with the defendant.  She also suffers from impairments to her right shoulder as diagnosed by her medical provider(s).  As a result, plaintiff is substantially limited in performing the major life activities of lifting, sleeping, working, and using her limbs above her head.  Specifically, plaintiff has been diagnosed with chronic right shoulder pain, right rotator cuff tendonitis, bursitis of her right shoulder, cervical muscle strains and spasms, and cervicalgia.

13.     That on or about January 2, 2023 defendant hired plaintiff as a Presales Route Associate, a position which required the plaintiff to travel to the defendant's customer locations which included grocery and convenience stores to take orders for Cheerwine.  Thereafter, defendant would deliver the product to the customer in amounts consistent with the orders plaintiff took from them.

14.     That approximately four (4) months after being hired, defendant promoted plaintiff to a Merchandiser Manager position – a true supervisory position at defendant and a position plaintiff held until she left the company.

15.     That as to plaintiff's chain of command at defendant, as  Merchandiser Manager plaintiff initially reported to the General Manager, Charlie Holly ("Holly").  In or around April of 2024 Holly left the position and an existing employee, Rick Simmons ("Simmons"), was transferred into the General Manager position (and became plaintiff's new

3

supervisor).   Holly and then Simmons reported directly to the Regional Manager, Herman Meetze ("Meetze") who lived in Summerville, South Carolina and who was assigned to cover the Columbia, Charleston and Harleyville, South Carolina markets.  Meetze, in turn, reported to the owners of the defendant, Cliff and Carl Ritchie who worked out of Salisbury, North Carolina. Otherwise, plaintiff had dealings with defendant's Human Resources Safety Director, Jill Rufty ("Rufty").

16.    That for her part, plaintiff supervised between ten (10) to fifteen (15) Merchandisers and she was assigned to cover 108 store locations.

17.    That up until in or around April of 2024, plaintiff had the authority to hire, discipline and fire employees under her in the chain of command.  Thereafter, when Simmons became the new General Manager, plaintiff was required to seek his approval to undertake such actions.

18.    That plaintiff performed her job duties at defendant in an above-satisfactory fashion and otherwise maintained an excellent employment record there.   To this point, defendant promoted plaintiff into a management position (Merchandiser Manager), it offered plaintiff the Sales Manager job in April of 2024, as Merchandiser Manager the turnover rate for Merchandisers drastically declined due to plaintiff's management style, defendant gave her raises, her supervisors routinely praised plaintiff's job performance and plaintiff did not receive any discipline at defendant until Simmons became her General Manager, and the discipline he gave her was false, unworthy of credence, and discriminatory.

19.    That all went well for plaintiff in terms of her job at defendant until Simmons took over as her supervisor and General Manager.

20.     That shortly after becoming the General Manager, Simmons began to discriminate against plaintiff due to her gender by treating her in a rude and antagonistic manner, by disciplining her without cause, by cutting her commission rate, and by ultimately firing plaintiff.  To this point, Simmons first ordered the plaintiff to work on a Saturday after she had already worked five (5) full days that week, all because a male employee refused to work over the Mother's Day weekend.

21.     That at or about 6:42 a.m. on or about the following Monday, May 13, 2024, well before the start of plaintiff's scheduled shift, plaintiff timely notified Simmons that she needed to take the day off (and use a sick day) because she pulled a muscle at work on Saturday.

22.     That on or about Tuesday, May 14, 2024, within one (1) hour of plaintiff returning to work, Simmons angrily gave plaintiff a Final Written Warning (and a 30-day performance improvement plan) allegedly because plaintiff did not finish her task of reviewing and correcting employee timecards over the weekend.  Yet plaintiff was forced to work over the weekend, thereby reducing the time she had to perform the task and, more importantly, other (similarly situated) male managers who were assigned to complete the same task also failed to complete it and they were not disciplined.  For example, a male manager, Chad Hamby ("Hamby") was still fixing and completing his drivers' payroll on that Monday and another male manager, Charlie Holley ("Holley"), never prepared or turned in any payroll or employee timecards at all.  Neither of these male employees were written up.

23.     That on or about May 21, 2024, in one of the first meetings plaintiff had with Simmons, Simmons found it appropriate to tell plaintiff that he had never worked with a woman before.  At the time, plaintiff was the only female employee at defendant.

24. That on or about June 23, 2024, during her yearly raise discussion with Simmons, Simmons raised plaintiff's salary due to a "salary increase for exempt employees" but, at the same time, he reduced plaintiff's commission rate from .02% to .01% without reason or cause. Simmons did **not** reduce the commission rate for any of the other similarly-situated male employees whose commission rate stayed at .02%

25. That on or about Thursday, June 27, 2024, plaintiff again pulled a muscle, this time at her last stop of the day (HT355), stacking 12-packs above her head.

26. That the next day, on or about Friday, June 28, 2024, plaintiff woke up with a lump protruding from the right side of her neck. That same day, plaintiff sent a text message to Simmons and another employee, CJ King ("King"), advising them of her injury and sending them a picture of it.

27. That on or about July 2, 2024, plaintiff informed Simmons that she needed to be seen by a doctor because the lump in her neck was not going down.

28. That as such, on or about July 2, 2024, plaintiff was seen at Doctors Care for the lump on her neck. Following examination, plaintiff was diagnosed with a muscle strain of her right shoulder and upper back due to repetitive work-related activity. Plaintiff was referred to physical therapy, prescribed medication (Cyclobenzaprine), and placed on light duty at work. Plaintiff was also given a follow-up appointment in two weeks.

29. That on or about July 8, 2024, plaintiff started physical therapy three (3) times a week as instructed by her medical provider.

30. That on or about July 12, 2024, plaintiff attended an appointment at Roper St. Francis Physician Partners – Orthopaedics. Her medical provider there, Jefferson T. Rabe, PA-C ("Rabe"), provided plaintiff with a note (which plaintiff, in turn, provided to her employer,

6

including Simmons) which placed plaintiff on light duty and which restricted her from lifting or carrying over ten (10) pounds and which also restricted her from "overhead work." In doing so, plaintiff sought and was granted a reasonable accommodation under the ADA and thereby engaged in protected activity under that Act.

31.   That on that same day (July 12, 2024), at approximately 4:15 p.m., Simmons advised plaintiff that defendant wanted to place plaintiff out of work on worker's compensation leave until further notice. When plaintiff called defendant's Human Resources Manager Rufty to protest, Rufty confirmed to plaintiff that Simmons had already called her and requested that plaintiff be put out of work on workers' compensation leave, but that she (Rufty) did not agree with that course of action. Thus, plaintiff continued to work and to perform her duties in an above-average fashion despite her impairments.

32.   That on or about August 14, 2024, Simmons called plaintiff and directed her to take a week off and to report back to work on August 19, 2024, performing a different job in Repack, an unsanitary area in the back of the warehouse, where plaintiff was tasked with cleaning and repacking damaged product that was covered with bees and maggots.

33.   That the next day, on or about August 15, 2024, plaintiff had an MRI on her shoulder. At some point plaintiff filed or initiated a worker's compensation claim against the defendant.

34.   That on or about August 28, 2024, plaintiff had a follow-up appointment with Rabe at Roper St. Francis Physician Partners - Orthopaedic. During the appointment Rabe could not diagnose the lump on plaintiff's neck. As such, Rabe ordered another MRI – this time for plaintiff's cervical spine, and directed plaintiff to remain on light duty, restricting her from lifting over ten (10) pounds and prohibiting any overhead work. As such, plaintiff again

requested a reasonable accommodation under the ADA and thereby engaged in ADA protected activity.

35.   That on or about September 6, 2024 plaintiff had the cervical spine MRI and on September 11, 2024, she had a follow-up appointment with Rabe.  After seeing plaintiff on this occasion, Rabe prepared a note for plaintiff's employer stating plaintiff could return to light duty immediately with the only restriction being "no overhead lifting" and, as such, plaintiff sought a reasonable accommodation under the ADA and thereby engaged in protected activity under the ADA.

36.   That on or about September 16, 2024 (and only when plaintiff reduced her work restrictions) defendant allowed plaintiff to return to her regular job, with her sole restriction being "no overhead work."

37.   That on or about October 3, 2024, plaintiff exchanged text messages with her worker's compensation Nurse Case Manager explaining that her physical therapy appointments were interfering with her work schedule, making her days longer than they needed to be and that the physical therapy treatments were not working (or were not effective).

38.   That at or about 6:42 a.m. on or about October 4, 2024, plaintiff informed her Sales Manager and her General Manager, Simmons, that she was not feeling well and may not complete her entire store list.

39.   That on or about that same day (October 4, 2024) Simmons gave plaintiff a final written warning for not working three (3) stores correctly. Specifically, Simmons advised that plaintiff was not filling the top shelves with merchandise and had been late and/or missed a few merchandiser meetings.

40. That in response, plaintiff reminded Simmons that she had a worker's compensation restriction in place which prohibited her from any and all overhead work. Simmons, who became visibly angry at plaintiff's remark, responded in an antagonistic manner that, "Your right shoulder is bad. You still have a good left arm."

41. That to that remark, plaintiff advised Simmons in clear terms that she felt he was targeting her because she is female and, in doing so, plaintiff engaged in protected activity under Title VII.

42. That on or about November 18, 2024, plaintiff provided defendant with a medical note stating that she could return to light duty immediately with the following restrictions: No overhead lifting greater than ten (10) pounds. In doing so, plaintiff again requested a reasonable accommodation under the ADA and thereby engaged in protected activity. Otherwise, plaintiff continued to work.

43. That on or about November 19, 2024, plaintiff hired a worker's compensation attorney who, in short order, sent defendant a letter of representation.

44. That on or about Wednesday, November 27, 2024, Simmons asked plaintiff to meet with him in the warehouse so that they could work on next week's schedule and stated he would have someone else finish the last three (3) stores on plaintiff's route that day.

45. That when plaintiff arrived at the meeting, Simmons and Meetze were present. During the meeting plaintiff was fired and told that one of her employees (a Merchandiser) gave them a text message from plaintiff to the Merchandiser that contained the word "fuck." Plaintiff was told this was considered "misconduct" and was grounds for termination. In viewing the screenshot of the text message, it had no date or time and no phone number on it. Plaintiff did not recognize the text message and advised Simmons and Meetze

9

that she did not remember talking to her employee like that.  Plaintiff did not prepare or send the text message at issue.

46.    That in further response to her termination for using profanity, plaintiff advised both Simmons and Meetze that she had personally observed many male managers in the office using far worse profanity toward their employees than what she was charged with and they were not even disciplined, let alone fired.  Simmons agreed and replied he was aware of and working on the profanity and bantering by other (male) managers in the office with their drivers and/or specialists.

47.    That the employee who allegedly provided the text message to Simmons and Meetze (Donny) advised others in writing that he never sent or gave a screenshot or text message to anyone and that the one in question was not from his phone as there was no date, time or phone number on it.

48.    That the reason(s) given to plaintiff by defendant for her termination are false and/or unworthy of credence.  Plaintiff was really fired because of her gender and/or in retaliation for engaging in protected activity under Title VII, the ADA, and/or for filing a worker's compensation claim.

49.    That moreover, similarly-situated male employees outside of plaintiff's protected class engaged in the same conduct plaintiff is alleged to have engaged in without discipline, discharge or consequence.

**FOR A FIRST CAUSE OF ACTION:**
**VIOLATION OF TITLE VII**
**TERMINATION BASED UPON GENDER**

50.    That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 49 hereinabove as fully as if set forth verbatim.

51.     That at all relevant times as defined by Title VII, defendant employed over fifteen (15) employees and, as such, is subject to Title VII.

52.     That plaintiff is female.

53.     That plaintiff performed the duties of her job at defendant in a manner that satisfied the legitimate and reasonable expectations of the defendant.

54.     That plaintiff suffered an adverse action in that she was repeatedly disciplined, her commissions were cut, and she was terminated by the defendant.

55.     That after firing plaintiff defendant hired or assigned someone from outside of plaintiff's protected class to replace plaintiff and/or to perform the duties of plaintiff's job and/or defendant kept plaintiff's position open after firing her.

56.     That in addition to the above, plaintiff was the only female in a management position at defendant and defendant otherwise was a male-dominated (and populated) company when it came to management-level employees. Moreover, many similarly-situated management employees outside of plaintiff's protected class engaged in conduct that was the same or similar to the conduct plaintiff is alleged to have engaged in and they were treated more favorably than plaintiff in that they were not disciplined or fired.

57.     That finally, defendant treated plaintiff less favorably than similarly-situated male employees by reducing plaintiff's commission rate, by writing her up, and by treating her in a hostile and antagonistic manner during her employment with defendant.

58.     That the reasons defendant gave plaintiff for terminating her were false and/or unworthy of credence.  Defendant really fired plaintiff because she is female.

59.     That as such, defendant violated Title VII by terminating plaintiff because of her gender.

11

60.    That as a direct result of the actions of the defendant, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, compensation for wrongfully-withheld PTO hours earned by plaintiff, economic injury, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries, and plaintiff further seeks damages from the defendant in the form of reasonable attorney's fees and costs and prejudgment interest, all as authorized by Title VII.

61.    That defendant's actions as described above were undertaken intentionally, willfully, wantonly, knowingly and with reckless indifference to plaintiff's federally protected rights and, therefore, plaintiff is entitled to recover punitive damages from the defendant.

## FOR A SECOND CAUSE OF ACTION:
### VIOLATION OF TITLE VII
### RETALIATION

62.    That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 61 hereinabove as fully as if set forth verbatim.

63.    That at all relevant times as defined by Title VII, defendant employed over fifteen (15) employees and, as such, is subject to Title VII.

64.    That plaintiff engaged in protected activity under Title VII on or about October 4, 2024, when she advised Simmons and Meetze that she believed Simmons was targeting her because she is female and thereby opposed conduct made illegal by Title VII.

65.    That thereafter defendant fired plaintiff and, therefore, plaintiff suffered an adverse action.

66.     That only a short period of time elapsed between plaintiff's protected activity and her termination.  Specifically, defendant fired plaintiff approximately one (1) month and three (3) weeks after plaintiff engaged in protected activity.  As such, a causal connection existed between the two events.

67.     That moreover, defendant fired plaintiff for false reasons and/or for reasons unworthy of credence.  In addition to that, many similarly-situated male employees outside of plaintiff's protected class (who did not engage in protected activity) engaged in conduct that was the same or similar to the conduct plaintiff is alleged to have engaged in and they were treated more favorably than plaintiff in that they were not disciplined or fired like plaintiff was.

68.     That plaintiff was really fired in retaliation for engaging in protected activity under Title VII and, as such, defendant has violated Title VII, 42 U.S.C. § 2000e-3.

69.     That as a direct result of the actions of the defendant, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, compensation for wrongfully-withheld PTO hours earned by plaintiff, economic injury, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries, and plaintiff further seeks damages from the defendant in the form of reasonable attorney's fees and costs and prejudgment interest, all as authorized by Title VII.

70.     That defendant's actions as described above were undertaken intentionally, willfully, wantonly, knowingly and with reckless indifference to plaintiff's federally protected rights and, therefore, plaintiff is entitled to recover punitive damages from the defendant.

**FOR A THIRD CAUSE OF ACTION:**
**RETALIATION FOR FILING**
**A WORKER'S COMPENSATION CLAIM**
**VIOLATION OF S.C. CODE § 41-1-80**

71.     That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 70 hereinabove as fully as if set forth verbatim.

72.     That plaintiff filed a claim for worker's compensation benefits against the defendant while still employed by defendant.

73.     That shortly thereafter, defendant, by and through Simmons, retaliated against plaintiff for doing so by firing plaintiff.

74.     That Simmons openly expressed anger towards plaintiff for filing her worker's compensation claim.

75.     That defendant violated S.C. Code § 41-1-80 by firing plaintiff because she filed a worker's compensation claim and, as such, defendant is liable for her lost wages, including payment for wrongfully withheld PTO hours earned by plaintiff.

**FOR A FOURTH CAUSE OF ACTION:**
**VIOLATION OF THE ADA**
**TERMINATION BASED UPON DISABILITY**
**AND/OR PERCEIVED DISABILITY**
**(42 U.S.C. § 12101)**

76.     That plaintiff hereby repeats and realleges each and every allegation in Paragraphs 1 through 75 hereinabove as fully as if set forth verbatim.

77.     That as alleged above, at all pertinent times as defined by the ADA defendant employed fifteen (15) or more employees and, thus, is an "employer" as defined by said Act and otherwise subject to it.

78.     That as a result of plaintiff's chronic and long-term shoulder impairments, plaintiff was substantially limited in one or more major life activity, namely lifting, sleeping and

14

using her hands above her head.  Moreover, the impairments identified above are chronic, long-term and likely lifetime impairments.

79.    That despite the above, plaintiff could perform the essential duties of her job at defendant, with or without reasonable accommodations in the form of intermittent medical leave and restrictions on the amount of weight she could lift when doing overhead work.

80.    That as such, the plaintiff is disabled as defined by the ADA. Moreover, the defendant regarded or perceived plaintiff as being disabled as defined by that Act, and it erroneously believed plaintiff's disabilities, or perceived disabilities, prevented her from performing the essential duties of her position at defendant.

81.    That as alleged, plaintiff performed her job duties at defendant at a level that met defendant's legitimate expectations.

82.    That despite the above, defendant fired plaintiff without cause (even though the defendant has and utilizes a progressive discipline policy) and for false reasons and/or reasons unworthy of credence.

83.    That thereafter, defendant hired or assigned someone to perform the duties of plaintiff's job that was outside of plaintiff's protected class or, alternatively, it left plaintiff's position open.   Moreover, defendant treated similarly-situated employees outside of plaintiff's protected class more favorably than it treated plaintiff when they engaged in conduct defendant alleged plaintiff engaged in and fired plaintiff for it.  And Simmons was openly hostile to plaintiff because of her impairments and because of the small number of absences related to them.

84.    That based upon the above (among other things) defendant violated the ADA by firing  plaintiff because of her disabilities and/or perceived disabilities, by firing plaintiff because of the absences and potential absences associated with her disabilities, and by firing plaintiff

because defendant erroneously believed that plaintiff's disabilities or perceived disabilities rendered her unable to perform the essential duties of her job.

85.   That as a result of defendant's actions as set forth above, plaintiff has been damaged in the form of lost back and future wages, income and benefits, expenses associated with finding other work, compensation for wrongfully withholding payment for PTO hours earned by plaintiff, severe psychological harm, emotional distress, pain and suffering, loss of enjoyment of life, anxiety, depression, inconvenience, mental anguish, embarrassment, humiliation, loss of professional standing, character and reputation, physical and personal injuries and plaintiff further seeks her reasonable attorney's fees and costs and prejudgment interest.

86.   That defendant's actions as described above were undertaken intentionally, willfully, wantonly, knowingly and with reckless indifference to plaintiff's federally protected rights and, therefore, plaintiff is entitled to recover punitive damages from the defendant.

## FOR A FIFTH CAUSE OF ACTION: <br> VIOLATION OF THE ADA <br> RETALIATION

87.   That plaintiff hereby repeats and realleges each and every allegation in Paragraphs 1 through 86 hereinabove as fully as if set forth verbatim.

88.   That as alleged above, at all pertinent times as defined by the ADA defendant employed fifteen (15) or more employees and, thus, is an "employer" as defined by said Act and otherwise subject to it.

89.   That plaintiff engaged in protected activity under the ADA by repeatedly asking for reasonable accommodations in the form of lifting restrictions and restrictions related to performing overhead work.

16

90. That on or about October 4, 2024, Simmons became visibly angry with plaintiff when discussing plaintiff's work restrictions and wrote plaintiff up when her restrictions prevented her from filling the higher shelves with defendant's product, a task which would have required plaintiff to engage in overhead work and violate that restriction. Plaintiff protested and thereby engaged in protected activity under the ADA.

91. That on or about November 18, 2024, plaintiff last requested an accommodation by giving Simmons a note from her medical provider and thereby engaged in protected activity under the ADA (by seeking a reasonable accommodation under that Act).

92. That defendant fired plaintiff and, thus plaintiff suffered an adverse action.

93. That defendant fired plaintiff only nine (9) days after plaintiff last engaged in protected activity and, thus, a causal connection exists between the two events. Moreover, the reasons given by defendant to plaintiff for her termination are false and/or unworthy of credence, and similarly-situated employees outside of plaintiff's protected class were treated more favorably than plaintiff when they engaged in the same or similar conduct that defendant alleged plaintiff engaged in.

94. That as such, defendant fired plaintiff for engaging in protected activity under the ADA and thereby violated the retaliation provision of said Act.

95. That as a result of defendant's actions as set forth above, plaintiff has been damaged in the form of lost back and future wages, income and benefits, expenses associated with finding other work, compensation for wrongfully withholding payment for PTO hours earned by plaintiff, severe psychological harm, emotional distress, pain and suffering, loss of enjoyment of life, anxiety, depression, inconvenience, mental anguish, embarrassment, humiliation, loss of professional standing, character and reputation, physical and personal

17

injuries and plaintiff further seeks her reasonable attorney's fees and costs and prejudgment interest.

96.     That defendant's actions as described above were undertaken intentionally, willfully, wantonly, knowingly and with reckless indifference to plaintiff's federally protected rights and, therefore, plaintiff is entitled to recover punitive damages from the defendant.

WHEREFORE, plaintiff prays for judgment against the defendant as follows:

(a) As to plaintiff's First and Second Causes of Action for violation of Title VII, and for plaintiff's Fourth and Fifth Causes of Action for violations of the ADA, for such and amount of actual and special damages as the trier of fact may find, including lost back and future wages, income and benefits, expenses associated with finding other work, compensation for wrongfully-withheld PTO hours earned by plaintiff, economic injury, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries, punitive damages, reasonable attorney's fees and costs and prejudgment interest and for such other and further relief as this court deems reasonable, just and proper; and

(b) As to plaintiff's Third Cause of Action for retaliation for filing a worker's compensation claim, for lost wages incurred by plaintiff including wrongfully-withheld PTO hours earned by plaintiff, and for such other and further relief as this court deems reasonable, just and proper.

HITCHCOCK & POTTS

By:  *s/A. Christopher Potts*
Federal ID No.:  5517
222 West Coleman Blvd., Suite 124 #11
Mt. Pleasant, SC 29464
Telephone:  (843) 577-5000
Email:  cpotts@hitchcock-potts.com
***Attorneys for the Plaintiff***

Charleston, South Carolina
July 19, 2025